1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  RENE RODRIGUEZ, JR.,            )   NO. EDCV 10-01598 (SS)
                                    )
12              Plaintiff,          )
                                    )
13         v.                       )
                                    )   **MEMORANDUM DECISION AND ORDER**
14  MICHAEL J. ASTRUE,              )
    Commissioner of the Social      )
15  Security Administration,        )
                                    )
16              Defendant.          )
    _____)

17

18                              **I.**

19                          **INTRODUCTION**

20

21      Plaintiff Rene Rodriguez, Jr. ("Plaintiff") brings this instant

22  action seeking to overturn the decision of the Commissioner of the

23  Social Security Administration (hereinafter the "Commissioner" or the

24  "Agency") denying his application for period of disability and

25  Disability Insurance Benefits ("DIB"). On October 19, 2010, Plaintiff

26  filed a request to proceed In Forma Pauperis ("IFP request") and lodged

27  a complaint (the "Complaint"). On October 25, 2010, this Court granted

28  Plaintiff's IFP request and filed his Complaint.  Pursuant to this

Court's October 26, 2010 order, the Commissioner filed an answer ("Answer") and a certified Administrative Record ("AR") on February 24, 2011.  Plaintiff then filed a memorandum of points and authorities in support of his Complaint ("Plaintiff's Memorandum") on April 25, 2011, and the Commissioner filed a memorandum in support of the Commissioner's Answer ("Commissioner's Memorandum") on June 24, 2011.  The parties consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for DIB on June 20, 2008.  (AR 86). In his application, Plaintiff claimed he became disabled on June 1, 2008.  (Id.).  The Agency initially denied Plaintiff's claim on October 3, 2008.  (AR 54-57).  On February 4, 2009, the Agency denied Plaintiff's claim again on reconsideration.  (AR 58-62).  On April 2, 2009, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 63).  The Agency scheduled a hearing for March 2, 2010. (AR 70).

At the hearing, Plaintiff and Luis Moss, a vocational expert, testified before the ALJ.  (AR 23-51).  On April 9, 2010, the ALJ issued an unfavorable decision.  (AR 6-18).  Plaintiff requested review of the ALJ's decision.  (AR 5).  On August 19, 2010, the Appeals Council denied Plaintiff's request, and the ALJ's decision became final.  (AR 1-3).

### III.

### FACTUAL BACKGROUND

Plaintiff was born on May 11, 1971 and was 37 at the time of the alleged onset of disability.  (AR 16, 83, 86).  He has reported completing twelfth grade, (AR 98), and can speak and understand English.  (AR 93).  Prior to the onset of the alleged impairments, Plaintiff worked as a warehouse associate, cashier and security guard.  (AR 138-39).  Plaintiff alleged that he cannot work due to back pain from ruptured discs, headaches, depression, and Carpal Tunnel Syndrome ("CTS").  (AR 29, 44, 94, 104, 213).

**A.   Plaintiff's Medical Evidence**

**1.   Dr. Sadler**

Dr. Charles Sadler initially examined Plaintiff on November 11, 1997, prior to the alleged onset of disability.  (AR 212).  In Dr. Sadler's initial physical examination, Plaintiff complained of a constant sharp lower back pain but denied any numbness, tingling, loss of bladder control or loss of bowel control.  (AR 213-14).  Plaintiff reported that the pain interfered with his ability to perform basic physical activities like sitting, standing, walking and driving.  (AR 214).  Plaintiff also complained of a dull pain in his neck and upper back that occurs approximately fifty percent of the time.  (Id.).  Dr. Sadler noted that both Plaintiff's neck and back motions were minimally or slightly limited with associated complaints of pain and that

1  Plaintiff's "right posterior iliac crest" was tender.  (AR 215-216).
2  Dr. Sadler reported no other abnormalities.  (AR 215-217).

3

4       Dr. Sadler recommended and scheduled an MRI of Plaintiff's lumbar
5  spine on December 4, 1997.  (AR 217, 225-26).  In his notes from
6  November 3, 1998, approximately ten years prior to the alleged onset of
7  disability, Dr. Sadler stated that Plaintiff's MRI showed significant
8  abnormalities. (AR 219). Dr. Sadler also noted that Plaintiff's x-rays
9  showed minimal degenerative changes. (AR 218).  On that date, Plaintiff
10 reported numbness and tingling in both his right hand and leg. (Id.).
11 The physical examination revealed that Plaintiff's neck motion was still
12 minimally limited with associated complaints of pain.  (Id.). However,
13 straight leg raising and L4-S1 motor function were both intact
14 bilaterally.  (AR 218).  Dr. Sadler diagnosed Plaintiff with a cervical
15 strain, a probable lumbar spine disc rupture and bilateral carpal tunnel
16 syndrome.  (AR 218).

17

18      Dr. Sadler opined that Plaintiff had certain work restrictions, but
19 he added that the restrictions were partially prophylactic and that the
20 restrictions could be relaxed if Plaintiff used bilateral wrist braces
21 with metal reinforcement.  (AR 219-20).  Although Dr. Sadler added that
22 temporary total disability would have been reasonable from September 2,
23 1997 to November 3, 1998, (AR 220), Plaintiff was not a candidate for
24 surgery at that time.  (AR 221).  Plaintiff reported to the Agency that
25 he resumed work in April 2001.  (AR 139).
26 //

27

28

4

### 2.   Plaintiff's Treatment Records

Shalini Bhatia, D.O., wrote a discharge summary of Plaintiff's hospitalization from October 9, 2007 to October 13, 2007 due to open wounds on his feet. (AR 146-47). Dr. Bhatia examined Plaintiff and reported that Plaintiff was normal other than obesity and decreased erythema of the lower extremity. (Id.). Dr. Roger Martinez wrote an emergency room report regarding the same hospitalization. (AR 148-49). Dr. Martinez also reported that Plaintiff had a normal review of systems other than the wounds on the lower extremities. (AR 148).

Similarly, Dr. Hanna Demarco examined Plaintiff and reported a normal physical besides Plaintiff's obesity and foot wounds. (AR 150-52). At Dr. Demarco's request, Dr. Brian Lipman examined Plaintiff on October 10, 2007. (AR 151, 153-54). Dr. Lipman diagnosed Plaintiff with a diabetic foot infection and ordered a three-phase bone scan and x-ray of Plaintiff's foot. (AR 154). The bone scan revealed no osteomyelitis, and the x-ray revealed no acute pathology. (AR 161, 163).

Plaintiff visited the Riverside County Regional Medical Center emergency room due to back pain on June 27, 2008. (AR 166-171). Plaintiff walked into the emergency room without assistance after being dropped off. (AR 166, 170). During the visit, Plaintiff reported a history of chronic back pain since 1997 and complained of localized lower back pain on the right side of his body and bilateral hand pain. (AR 166, 170). Plaintiff described the back pain as an "ache," rated the back pain as a nine out of ten, and rated the hand pain as a seven

out of ten.  (AR 170).  The physician's exam revealed generalized pain in Plaintiff's right flank without redness or swelling.  (AR 167).  The physician diagnosed Plaintiff with "chronic back pain," (id.), made no diagnosis regarding the hand pain, (see AR 166-171), and prescribed Motrin, Flexeril and Novolin N.  (AR 168, 171).

### 3.   Consulting Doctors

On September 19, 2008, Dr. Kristof Siciarz, a board eligible internal medicine specialist, submitted a summary report of an internal medicine evaluation.  (AR 172-76).  Dr. Siciarz took a medical history as reported by Plaintiff and examined Plaintiff.  (Id.).  Dr. Siciarz reported that "[Plaintiff] state[d] he has had back pain since 1997 after a work injury."  (AR 172).  Plaintiff also reported to Dr. Siciarz that he was diagnosed with bilateral carpal tunnel syndrome in 1997.  (Id.).  Dr. Siciarz reported that Plaintiff's past medical history was "significant" for diabetes and hypertension.  (Id.).

Regarding Plaintiff's treatment history, Plaintiff did not report any past surgical procedures, taking any medications at that time, or any drug allergies. (AR 172-73).  Plaintiff stated he had declined back surgery that other doctors recommended.  (AR 172).

At the time of the examination, Plaintiff complained of "a dull ache in the lower lumbar area that radiates down to the right leg" and numbness down the right leg.  (Id.).  Plaintiff stated that his symptoms intensified with bending and lifting but improved with rest.  (Id.).  Plaintiff also complained of intermittent twitching in his hands, sharp

6

1  pain in the back of his neck for approximately four years, and
2  intermittent leg swelling.  (Id.).

3

4      Dr. Siciarz's physical examination discovered "no significant
5  abnormalities."  (AR 175).  Dr. Siciarz reported that, although
6  Plaintiff is morbidly obese, his "[m]ovements [were] noted to be
7  normal," he "[did] not use an assistive device for ambulation," he
8  "could sit comfortably without shifting, and he "is able to stand up
9  from a sitting position and sit up from the supine position without
10 difficulty." (AR 173). Dr. Siciarz's back inspection "[did] not reveal
11 any evidence of significant kyphosis, lordosis, or noticeable scoliosis.
12 Palpation along the paravertebral area does not elicit complaints of
13 pain.   The range of motion appears to be within normal
14 limits.  Straight-leg rising is negative, bilaterally." (AR 174).  Dr.
15 Siciarz reported that Plaintiff's gait and station were within normal
16 limits.  (AR 174).  Dr. Siciarz also found that all other systems were
17 generally unremarkable or normal, (AR 173-175), and Plaintiff's mental
18 status was normal, observing that "[Plaintiff's] sensorium is clear and
19 alert.  [Plaintiff] is oriented to person, place, time, and the purpose
20 fo the evaluation."  (AR 173).

21

22     Dr. Siciarz found that Plaintiff's functional capacity was
23 restricted by Plaintiff's obesity, diabetes and hypertension. (AR 175).
24 Specifically, Dr. Siciarz restricted Plaintiff to pushing, pulling,
25 lifting and carrying fifty pounds occasionally and twenty-five pounds
26 frequently.  (Id.).  Dr. Siciarz also restricted Plaintiff to standing
27 and walking only six hours of an eight hour day.  (Id.).  However, he
28 did not restrict Plaintiff's ability to sit for extended periods of

time.   (Id.).   Dr. Siciarz found Plaintiff could occasionally participate in postural activities or activities requiring agility and did not restrict Plaintiff from hearing, seeing, speaking or using Plaintiff's hands.  (Id.).  Dr. Siciarz recommended fewer restrictions than the ones imposed by the ALJ.  (AR 12).

On October 2, 2008, Dr. Thu Do completed a Residual Functional Capacity Assessment form.  (AR 177-81, 183).  The assessment mirrored Dr. Siciarz's conclusions, but added that Plaintiff can only sit for six hours of an eight hour day.  (AR 178).  Although more restrictive than Dr. Siciarz's recommendations, Dr. Do recommended fewer restrictions on Plaintiff than the ones found by the ALJ. (AR 12).

On January 28, 2009, Dr. Reynaldo Abejuela, a diplomate of the American Board of Psychiatry & Neurology and a diplomate of the American Board of Forensic Examiners, performed a complete psychiatric evaluation of Plaintiff.  (AR 186-192).  Dr. Abejuela reported that Plaintiff stated feeling depressed, feeling anxious and preferring isolation. (AR 187).  Despite these feelings, Plaintiff stated that he was not seeing a psychiatrist or therapist and was not taking any psychiatric medication.  (Id.).

Plaintiff reported trouble sleeping, waking up "four to six times at night."  (Id.).  Plaintiff described experiencing loss of appetite and weight loss despite weighing 425 pounds.  (Id.).  Plaintiff complained of headaches but denied suicidal or homicidal ideation. (Id.).   Plaintiff also denied experiencing guilt, helplessness,

1  worthlessness, hopelessness or a decrease in pleasurable activities.

2  (Id.).

4      Plaintiff reported no history of psychiatric hospitalization and

5  denied drug or alcohol use.  (AR 187-88).  Plaintiff stated that he was

6  able to care for his hygiene and grooming without assistance, has no

7  hobbies or outside activities, and has "fair" relations with

8  others.  (AR 188).

10     Dr. Abejuela's observed that Plaintiff could walk without an

11 assistive device.  (Id.).  Dr. Abejuela reported that Plaintiff was

12 cooperative and non-hostile, and he noted no psychomotor retardation or

13 agitation.  (Id.).  Plaintiff's cognitive function was within normal

14 limits and commensurate to his level of education.  (Id.).  In his

15 discussion, Dr. Abejuela stated that Plaintiff has "some mild depression

16 and mild anxiety."  (AR 190).  However, "[Plaintiff's] [r]easoning and

17 comprehension remain[ed] intact and commensurate with [Plaintiff's]

18 educational level and cultural background. Cognitive function [was]

19 within normal [limits]."  (AR 190-91).  Dr. Abejuela reported that

20 Plaintiff had, at most, mild psychiatric limitations.  (AR 191).  Dr.

21 Abejuela concluded Plaintiff had a "fair to good" prognosis.  (AR 192).

23 **4.    Other Agency Observations**

25     In a Field Office Disability Report Form dated June 20, 2008, M.

26 Douglas interviewed Plaintiff in person.  (AR 90-92).  Under the

27 observations section, Mr. Douglas reported that Plaintiff had no

28 difficulty with any of the major categories of functionality, including

sitting, standing, walking, using hands or writing.  (AR 91).  Mr. Douglas also noted that Plaintiff was "pleasant and cooperative" and "in no apparent ortho distress."  (Id.).

**B.   Plaintiff's Testimony**

   **1.   Plaintiff's Hearing Testimony**

   On March 2, 2010, Plaintiff appeared pro se and testified at the hearing that he stopped working at the end of May 2008 as an armed security guard because of a back injury.  (AR 27).  Plaintiff reported that he had applied for "desk type jobs" since that time but has not received any responses.  (AR 29).  Plaintiff also described "extreme pain [in his] lower back" caused by a "ruptured disc that occurred during [his] employment with Avery Dennison."  (Id.).  Plaintiff elaborated that he was picking up a box and felt a sharp pain in his back.  (AR 30).

   Plaintiff testified that he did not have surgery to remedy his back problems because "[a]t the time, [the doctors] weren't giving [Plaintiff] a good outcome of the surgery."  (AR 30-31).  Later, the ALJ continued to question Plaintiff regarding treatments for his back.  (AR 34).  Plaintiff stated that the doctors suggested fusing his discs, but he opted to go with epidural injections.  (Id.).

   Plaintiff stated that he takes Novolin and Glyburide for his diabetes and reported that he currently takes Vicodin, Motrin, and over-the-counter drugs Advil and Tylenol for his back pain.  (AR 32, 35-36).

10

1    Plaintiff also stated he has not received anything stronger than Vicodin
2    from his current doctor, but a prior doctor in Las Vegas provided
3    OxyContin. (AR 36-37). Plaintiff also stated taking Soma, a muscle
4    relaxer. (AR 37). He testified that the "pain is there all the time
5    . . . [the medication will] help for the temporary. . . fix, but the
6    pain doesn't go away." (AR 32-33).

7

8    Plaintiff believed that doctors last x-rayed his spine in 2008
9    during an emergency visit. (AR 32). When the ALJ informed Plaintiff
10   that the medical records from the emergency room visit did not contain
11   an x-ray, Plaintiff responded that "[he] went to the ER." (Id.). The
12   ALJ also asked Plaintiff regarding the MRI mentioned in Dr. Sadler's
13   report. (AR 33). Plaintiff produced the MRI during the
14   Hearing. (Id.). The ALJ stated, "[The MRI] says then there was no
15   rupture." (Id.). To which, Plaintiff replied, "That's what he told
16   me." (Id.). Plaintiff also stated he has not had an MRI since the MRI
17   taken on December 4, 1997. (AR 33-34).

18

19   Plaintiff also testified that he experiences pain while sitting and
20   standing and stated that "[i]f [Plaintiff] sit[s], 20/30 minutes . . .
21   [he] feel[s] the discomfort depending on how [he] sit[s]." (AR 34).
22   Plaintiff stated that he can only stand for fifteen to twenty minutes
23   before experiencing pain. (AR 35). He testified that he cannot lift
24   "too much" because his fingers will start cramping and twitching due to
25   his CTS. (Id.).

26

27   Plaintiff stated he lives with his mother and a sibling's
28   granddaughter. (AR 38-39). Plaintiff initially testified that he does

11

no chores but later stated that he "picks up [his] clothes and [his] room." (AR 40). However, Plaintiff reported that any little activity, such as dusting, would cause pain. (Id.). Plaintiff stated that he primarily watches television while laying in bed and that he has not driven a vehicle in two years because "[driving] is uncomfortable for [Plaintiff]." (AR 37-38, 40).

The ALJ asked Plaintiff about his weight. (AR 41-42). Plaintiff testified that he is five feet ten inches tall and weighed over 400 pounds. (AR 41). Plaintiff testified that doctors told him to lose weight and he had successfully reduced his weight to approximately 375 pounds but subsequently gained the weight back. (Id.). Doctors later suggested a gastric bypass or an adjustable gastric band to help with his weight control. (AR 41-42).

Plaintiff stated that he has been depressed since his injury, suffers from migraines that cannot be relieved, and experiences a numbing sensation in both legs. (AR 44, 46). When asked if Plaintiff experienced any pain radiating down his legs, Plaintiff stated that it was "[l]ike a sharp pain" that radiates down each leg, one at a time, with greater frequency on his right side. (AR 45-46).

Plaintiff testified reporting depression and migraines to doctors. (AR 44). Although Plaintiff's doctors prescribed Vicodin for Plaintiff's migraines, the doctors did not prescribe any anti-depression medication because Plaintiff was not medically depressed. (AR 45). Plaintiff also testified that he has not had any infections in his feet since his hospitalization in 2007. (AR 46).

### 2.    Plaintiff's Adult Function Report

On January 3, 2009, Plaintiff filled out an adult function report form and a headache questionnaire provided by the Agency. (AR 118-27). In his function report, Plaintiff reported he only sleeps "about 4-5 hours of broken sleep due to pain." (AR 118). Plaintiff elaborated that he has lower back pain, bilateral hand pain, bilateral leg pain and headaches. (Id.). Plaintiff continued describing his typical day. (Id.). After waking up "at about 5AM-6AM," Plaintiff reported taking over-the-counter medication, taking hot showers, and using heating pads for temporary pain relief. (Id.).

Plaintiff stated he could not put shoes on without pain but described no other difficulties with self care. (AR 119). Plaintiff stated he prepares his own simple meals, such as sandwiches and frozen foods, approximately once a day. (AR 120). Plaintiff stated that he is unable to do any household chores but also states that he needs encouragement and family member help to do his chores. (AR 120).

Plaintiff reported that he goes outside around once a week, that he rides in a car when traveling, and that he could not go outside alone because "sometimes [Plaintiff's] back gives out . . . ." (Id.). Plaintiff also reported that he drives, (id.), inconsistent with his testimony that he has not driven in the past two years. (AR 37-38). Plaintiff reported shopping in stores for personal items approximately once a month. (AR 121). Plaintiff reported "watching T.V." as a hobby or interest that he does everyday. (AR 122). Plaintiff reported

13

spending time with others but also reported difficulties getting along with others because he becomes anti-social. (AR 122-23).

Plaintiff reported being able to walk one to two blocks before needing a five to ten minute rest. (AR 123). Plaintiff reported that he can follow written and spoken instructions well and that he has no problems getting along with authority figures. (AR 123-24).

In his headache questionnaire, Plaintiff reported his headaches became severe on or around July 2008. (AR 126). Plaintiff reported daily headaches with varying intensity. (Id.). Plaintiff described the pain as a "sharp pain from back of neck to top of head." (Id.). Plaintiff reported that doctors had not diagnosed the type of headache and treated his symptoms only with over-the-counter medication. (AR 127). However, the medication has not been effective at all times. (Id.). Plaintiff reported that his headaches were not treated due to his medical insurance. (Id.).

**C.   <u>Third Party Testimony</u>**

On January 3, 2009, Iris Perez, Plaintiff's mother, filled out a third party function report. (AR 110-17). Ms. Perez's statements are nearly identical to Plaintiff's report, in some cases using nearly identical language (<u>Compare</u> AR 111 <u>with</u> AR 119). Ms. Perez reported that Plaintiff spends most of his day in bed due to pain. (AR 110). Ms. Perez also reported that Plaintiff prepares his own meals, stating that "[Plaintiff] is able to do a quick meal[,] something fast[.] [U]nable to stand for long time." (AR 112). Ms. Perez stated that

14

1  Plaintiff prepares food once a day, taking him approximately five to ten
2  minutes.  (AR 112).

3

4      Ms. Perez reported that Plaintiff participates in household chores,
5  with assistance from family members.  (Id.).  However, Ms. Perez
6  reported that "[Plaintiff] is unable to do house/yard work due to pain."
7  (AR 113).  Ms. Perez also reported that Plaintiff goes outside
8  approximately once a week "if that."  (Id.).  Ms. Perez also reported
9  Plaintiff shops for personal needs and is able to shop for 30-60
10  minutes.  According to Ms. Perez, Plaintiff is able to pay bills, count
11  change, handle a savings account, and use checkbooks or money orders.
12  (Id.).

13

14      Ms. Perez stated that Plaintiff cannot do anything with heavy
15  activity and he primarily watches television.  (AR 114).  Ms. Perez
16  reported plaintiff spends time with family members that live with
17  Plaintiff   or   talked   to   family   members   on   the
18  telephone.  (Id.).  However, Ms. Perez reported that Plaintiff had
19  difficulties getting along with others because "[Plaintiff] has become
20  anti-social and short tempered." (AR 115). Ms. Perez stated Plaintiff
21  can only walk one to two blocks before needing a five minute rest.
22  (Id.).  Ms. Perez reported that Plaintiff follows written and spoken
23  instructions well, and that Plaintiff can interact with authority
24  figures well.  (AR 115-16).
25  \\
26  \\
27  \\
28

15

**D.    Plaintiff's Waiver Of Counsel**


The Agency sent Plaintiff a letter dated October 3, 2008 that informed Plaintiff that his claim had been denied.  (AR 54-57).  On page three and four of that letter, the Agency wrote the following:


**If You Want Help With Your Appeal**


You can have a friend, lawyer, or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify.  There are also lawyers who do not charge unless you win your appeal.  Your local Social Security office has a list of groups that can help you with your appeal.


(AR 56-57) (emphasis in original).  The Agency also provided Plaintiff with a telephone number to call if he had questions.  (AR 57).  On February 4, 2009, the Agency sent another letter notifying Plaintiff that his claims had been denied again.  (AR 58-62).  That letter contained the same notice as the October 3, 2008 letter.  (AR 61).


On May 22, 2009, the Agency sent Plaintiff a letter confirming receipt of Plaintiff's request for a hearing.  (AR 64-67).  The letter stated that Plaintiff may choose to bring a lawyer or another representative to the hearing to assist:

**Your Right to Representation**

You may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing.  If you decide to have a representative, you should find one immediately so that he or she can start preparing your case.

Some private lawyers charge a fee only if you receive benefits.  Some organizations may be able to represent you free of charge.  Your representative may not charge or receive any fee unless we approve it.

(AR 64-65) (emphasis in original).  The Agency also included a brochure entitled "Your Right to Representation" and a list of contacts to help find legal representation.  (AR 66-68).

Prior to Plaintiff's March 2, 2010 hearing, the Agency sent a Notice Of Hearing to Plaintiff.  (AR 70-82).  The letter included the same brochure as the May 22, 2009 letter, (AR 74, 76-77), and explained the hearing process.  (AR 71-73).  The ALJ also enclosed a letter to VE Luis O Mas, who would be testifying at the March 2, 2010 hearing.  (AR 81-82).  The enclosure contained a notification that stated the purpose of the VE testimony, the type of questions the VE would be asked, and who could ask questions.  (AR 82).  The notice explicitly stated that "[q]uestions may also be asked of [the VE] by [Plaintiff] (or representative, if any)."  (Id.).

17

At the March 2, 2010 hearing, the ALJ discussed with Plaintiff his right to counsel. (AR 25). The ALJ directed the following question to Plaintiff:

> I need to talk to you about a right that you have and that's the right to have an attorney or other representative here with you. It's not a requirement, but it is a right that you have. I know that you have been advised of this right previously and I see you're today without representation. Is it your wish to proceed today without representation?

(Id.). Plaintiff replied "[y]es," waiving his right to counsel at the hearing. (Id.).

**E.   ALJ's Efforts To Develop The Record**

**1.   Record Requests**

On June 25, 2008, the Agency contacted St. Rose Dominican Hospital requesting Plaintiff's medical records. (AR 144). The Agency specifically identified the alleged impairments and noted that the Agency requested the dates of treatment, the history of the impairments, the objective clinical findings, as well as the diagnosis and prognosis based on the clinical findings. (Id.). The letter also asked for an opinion regarding Plaintiff's ability to do "work-related physical and/or mental activities as appropriate." (AR 145). St Rose Dominical Hospital submitted notes and diagnostic results from Plaintiff's hospital stay from October 9 to October 13, 2007. (AR 146-63).

18

On December 24, 2008, the Agency contacted Riverside County Regional Medical Center to obtain Plaintiff's medical records. (AR 164). The letter provided some identifying information, the alleged impairments and a request for specific information. (Id.). The letter also requested a statement based on medical findings that expressed the treating doctor's opinion regarding Plaintiff's ability to do work related activities. (AR 165). Riverside County Regional Medical Center provided six pages of notes from a June 28, 2008 emergency room visit. (AR 166-71). On January 13, 2009, the Agency followed up for additional records. (AR 207).

In a May 22, 2009 letter, the Agency explained the hearing process to Plaintiff and also stated that Plaintiff should submit any additional evidence that Plaintiff intended for the ALJ to consider. (AR 65). The letter explained that "[i]f a physician, expert or other witness is not cooperating with the production of documents important to [Plaintiff's] case, [Plaintiff] may ask the ALJ to issue a subpoena that requires a person to submit documents or testify at [Plaintiff's] hearing." (Id.). The Agency also offered Plaintiff an opportunity to view the evidence in his file. (Id.).

In a February 3, 2010 Notice Of Hearing, like in the May 22, 2009 letter, the Agency again notified Plaintiff to submit all evidence as soon as possible so that the ALJ had a complete record. (AR 71). The Agency again offered Plaintiff an opportunity to review the evidence in his file. (Id.).

**2.    Scheduled Examinations**

On September 19, 2008, the Agency scheduled an Internal Medicine Evaluation.  (AR 172).   The Agency had Dr. Kristof Siciarz, M.D., a Board Eligible Internal Medicine Specialist, perform the evaluation.  (AR 172-76).  The Agency also scheduled Reynaldo Abejuela, M.D., a diplomate of the American Board of Psychiatry and Neurology and the American Board of Forensic Examiners, to evaluate Plaintiff's psychiatric condition on January 28, 2009.  (AR 186).

On March 2, 2010, Plaintiff testified at a hearing where the ALJ asked numerous questions.  (AR 26-51).  In particular, the ALJ asked Plaintiff regarding the specific cause of Plaintiff's disability, (AR 29), what treatments Plaintiff sought to treat his back, (AR 30), reasons for electing or declining treatment options, (AR 31-32, 34, 41-42), past record of diagnostic tests, (AR 32), current treatments, (AR 33, 36-37), current limitations, (AR 34-35), Plaintiff's daily life, (AR 37-40), and any other information Plaintiff believed would be relevant to the ALJ's decision.  (AR 44-47).

**IV.**

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to

---

[1]    Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay

result in death or to last for a continuous period of at least twelve months.  See Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To determine if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  See 20 C.F.R. § 416.920 ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled, as defined in § 416.905.").  The steps are:

   (1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

   (2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled. If so, proceed to step three.

   (3)  Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

   (4)  Is the claimant capable of performing h[er] past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

   (5)  Is the claimant able to do any other work? If not, the

or profit.  See 20 C.F.R. § 416.910.

claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); see 20 C.F.R. § 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five.  See Bustamante, 262 F.3d at 953-54; see Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995) (holding that "[t]he claimant bears the burden of proving entitlement to disability benefits."); see Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) ("In determining the ultimate issue of disability, claimant bears the burden of proving she is disabled."). If, at step four, the claimant meets her burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education and work experience. See Tackett, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

22

## V.

### THE ALJ'S DECISION

Here, the ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled under the Social Security Act. (AR 9-18). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability on June 1, 2008. (AR 11). At step two, the ALJ determined that Plaintiff suffered three severe impairments: (1) morbid obesity; (2) diabetes mellitus; and (3) degenerative disc disease of the lumbosacral spine. (AR 11). The ALJ concluded that Plaintiff's alleged mood disorder was nonsevere because Plaintiff did not provide evidence indicating that Plaintiff received treatment for his mood disorder or suffered episodes of decompensation during the relevant time period. (AR 11-12). The ALJ concluded that Plaintiff's mental impairment causes no more than mild limitations and is nonsevere pursuant to 20 CFR 404.1520a(d)(1). (AR 12)

At step three, the ALJ concluded that Plaintiff's impairments does not match or equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 12). At step four, the ALJ determined that Plaintiff could not perform his past relevant work. (AR 16).

To reach his step four conclusion, the ALJ first determined Plaintiff's residual functional capacity. (AR 12-16). The ALJ determined Plaintiff's residual functional capacity with the following steps: (1) determining whether Plaintiff suffered an underlying medically determinable impairment that could reasonably be expected to

produce Plaintiff's symptoms, and (2) how much those symptoms limit Plaintiff's ability to function. (AR 12). The ALJ considered Plaintiff's testimony, any medical evidence in the record, as well as third party statements to reach his conclusion. (AR 13-16).

The ALJ determined that Plaintiff suffered from medically determinable impairments that could reasonably be expected to cause Plaintiff's alleged symptoms. (AR 14). However, the ALJ found that Plaintiff was not credible regarding the severity of his symptoms. (Id.). The ALJ based his credibility determination on inconsistencies between Plaintiff's testimony and the record. (AR 13, 14-16). The ALJ also rejected the third party function report submitted by Plaintiff's mother because, among other things, it largely repeated Plaintiff's function report and discredited allegations. (AR 14). Although the ALJ did not find Plaintiff credible, the ALJ concluded that Plaintiff suffered from the following restrictions that were far more restrictive than the limitations suggested by the consulting examiners:

> "[Plaintiff] could lift 10 pounds frequently and 20 pounds occasionally; he could stand and/or walk 2 hours in an eight-hour workday; he could sit without any restrictions but with normal breaks every 2 hours; the claimant could not climb ladders, ropes, and scaffolds, but he could occasionally climb ramps and stairs; he could occasionally balance, stoop, kneel, crouch, and crawl."

(AR 12). Based on these limitations, the ALJ determined that Plaintiff could not return to any past relevant work. (AR 16).

1    At step five, the ALJ determined that a person with Plaintiff's
2  age, education, work experience and residual functional capacity could
3  meet the requirements of jobs that exist in significant numbers in the
4  national economy. (AR 17). The ALJ based his decision on vocational
5  expert ("VE") testimony. (See id.). The VE testified that Plaintiff
6  could work as a "small parts assembler," "Cashier II" and "Production
7  Assembler." (AR 17, 48-49). The ALJ found that the VE testimony was
8  consistent with the Dictionary of Occupational Titles ("DOT")
9  definitions. (AR 17). Therefore, the ALJ concluded that Plaintiff was
10 not disabled under the Social Security Act. (Id.)

11

12                                  **VI.**

13                          **STANDARD OF REVIEW**

14

15    Under 42 U.S.C. § 405(g), a district court may review the
16 Commissioner's denial of benefits. "The findings of the Secretary as
17 to any fact, if supported by substantial evidence, shall be conclusive."
18 See Andrews, 53 F.3d at 1039. Therefore, "[t]he Secretary's decision
19 to deny benefits will be disturbed only if it is not supported by
20 substantial evidence or is based on legal error." Id.; see Aukland v.
21 Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (holding that "[t]his
22 court may set aside the Commissioner's denial of benefits when the ALJ's
23 findings are based on legal error or are not supported by substantial
24 evidence in the record as a whole."); see also Smolen v. Chater, 80 F.3d
25 1273, 1279 (9th Cir. 1996).

26

27

28

1    "Substantial evidence is more than a scintilla, but less than a

2    preponderance." Reddick, 157 F.3d at 720.  It is "relevant evidence

3    which a reasonable person might accept as adequate to support a

4    conclusion." Id.  To determine whether substantial evidence supports

5    a finding, the court must "'consider the record as a whole, weighing

6    both evidence that supports and evidence that detracts from the

7    [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny

8    v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)); see also Andrews, 53 F.3d

9    at 1039.  "If the evidence can reasonably support either affirming or

10   reversing the Secretary's conclusion, the court may not substitute its

11   judgment for that of the Secretary." See Reddick, 157 F.3d at 720-21.

12   Indeed:

13

14          To determine whether substantial evidence supports the ALJ's

15          decision, [the Court of Appeals] review[s] the administrative

16          record as a whole, weighing both the evidence that supports

17          and that which detracts from the ALJ's conclusion.  The ALJ

18          is responsible for determining credibility, resolving

19          conflicts in medical testimony, and for resolving

20          ambiguities.  [The Court of Appeals] must uphold the ALJ's

21          decision where the evidence is susceptible to more than one

22          rational interpretation.

23

24   Andrews, 53 F.3d at 1039-40.

25

26

27

28

**VII.**

**DISCUSSION**

Plaintiff contends that the Commissioner's decision should be reversed for the following reasons: (1) the ALJ failed to obtain a fully informed waiver of Plaintiff's right to counsel; (2) the ALJ failed to properly consider all of the relevant medical evidence; (3) the ALJ failed to properly consider Plaintiff's subjective complaints; (4) the ALJ failed to consider third party statements. (Plaintiff's Memorandum at 2-11). Plaintiff appears to also argue that the ALJ did not satisfy his duty to fully develop the record. (Plaintiff's Memorandum at 3-6). The Court disagrees with Plaintiff's contentions. For the reasons stated below, the ALJ's decision is AFFIRMED.

**A.** **Plaintiff Validly Waived His Right To Counsel Because The ALJ Properly Notified Plaintiff Of His Right To Representation**

Plaintiff contends that Plaintiff did not properly waive his right to counsel because the ALJ did not provide Plaintiff with sufficient notice of Plaintiff's rights. (Plaintiff's Memorandum at 2-6). In particular, Plaintiff contends that the ALJ "failed to properly inform him of the multiple ways in which an attorney representative could assist in the full and fair development of [Plaintiff's] case" such as obtaining evidence and cross-examining vocational experts. (Plaintiff's Memorandum at 4-5). The Court disagrees.

27

When a claimant appears at a hearing without counsel, the ALJ has an obligation to inform the claimant of options other than self-representation.  The Ninth Circuit has held that an ALJ must explain to a pro se claimant in a disability case the "avenues which [the pro se claimant] could pursue in obtaining counsel," or alternatively, the ALJ must probe for additional facts and "explain to the claimant the type of showing which the applicant had to make in order to prove his case successfully." Cruz v. Schweiker, 645 F.2d 812, 814 (9th Cir. 1981).

However, the Ninth Circuit recently rejected notice standards that exceed the requirements listed in 42 U.S.C. 406(c).  See Roberts v. Comm'r Of The Soc. Sec. Admin., __ F.3d __, 2011 WL 1998337, at *2 (9th Cir. May 24, 2011) (per curiam).  In Roberts, the Ninth Circuit held that an ALJ meets his duty to notify pro se claimants of their right to counsel if the ALJ satisfies the standards stated in 42 U.S.C. section 406(c).  Id.  42 U.S.C. section 406(c) states that an ALJ is obligated to inform a pro se claimant in writing "of the options for obtaining attorneys to represent [the claimant] in presenting their case before the Commissioner of Social Security" with any notices of adverse decisions, and "[s]uch notification shall also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge."  The Ninth Circuit stated that "the statutory requirements are all that [a court] can apply," and that "no disclosure is required other than the disclosure required by [42 U.S.C.] section 406(cd)."  Id. (citing Lamay v. Comm'r of Soc. Sec. Admin, 562 F.3d 503, 508 (2d Cir. 2009)).

28

1    Here, the Commissioner clearly satisfied his duty to notify
2    Plaintiff of his right to counsel.  42 U.S.C. section 406(c) requires
3    the Commissioner to provide written notice "of the options for obtaining
4    attorneys to represent [the claimant] in presenting their case before
5    the Commissioner of Social Security" with any adverse decisions, and
6    "[s]uch notification shall also advise the claimant of the availability
7    to qualifying claimants of legal services organizations which provide
8    legal services free of charge." Here, Plaintiff received written notice
9    of his right to counsel that included options for obtaining attorneys
10   and information regarding the availability of free legal services with
11   each notice of adverse decision.  (See AR 54-57, 70-82)

12

13   The Agency sent written notices describing his right to counsel in
14   multiple notices.  On October 3, 2008, the Agency sent Plaintiff a
15   Notice of Disapproved Claims.  (AR 54-57).  On page three of the October
16   3, 2008 notice, the notice states that "[y]ou can have a friend, lawyer,
17   or someone else help you.  There are groups that can help you find a
18   lawyer or give you free legal services if you qualify.  There are also
19   lawyers who do not charge unless you win your appeal.  Your local Social
20   Security office has a list of groups that can help you with your
21   appeal." (AR 56-57).  On February 4, 2009, the Agency sent Plaintiff
22   another Notice of Disapproved Claims after Plaintiff requested review.
23   (AR 58-62).  Page four of that notice contains a nearly identical
24   statement regarding rights and information regarding counsel.  (AR 61).

25

26   Additionally, the Agency provided Plaintiff with a detailed leaflet
27   titled "Your Right To Representation" in a May 22, 2009 notice of
28   hearing.  (AR 64-68).  Furthermore, the Agency provided additional

1  notices regarding Plaintiff's right to counsel on February 3, 2010, (AR
2  71), and at the March 2, 2010 hearing.  (AR 25).  Therefore, the Agency
3  and the ALJ adequately notified Plaintiff regarding his right to counsel
4  under 42 U.S.C. section 406(cd).

5

6     Plaintiff argues that this Court adopt the heightened notice
7  standards from other decisions.  (Plaintiff's Memorandum at 3-4).
8  Specifically, Plaintiff cites to Gullett v. Chater, 973 F. Supp. 614
9  (E.D. Tex. 1997), and Vaile v. Chater, 916 F. Supp. 821 (N.D. Ill.
10 1996).  (Plaintiff's Memorandum at 3-4).  The court in Gullett held that
11 a valid waiver of counsel requires the claimant receive written notice
12 prior to a hearing and oral notice at the beginning of a hearing of the
13 following elements: (1) how an attorney can help; (2) availability of
14 free counsel or a contingency arrangement; and (3) the twenty-five
15 percent of past due benefits limit on attorney's fees. Gullett, 973 F.
16 Supp at 620 (citing Clark v. Schweiker, 652 F.2d 399, 403 (5th Cir.
17 1981)).  The court in Vaile required the ALJ to explain the above
18 factors to a claimant.  Vaile, 916 F. Supp at 828.  These cases are
19 inapplicable because the Ninth Circuit has rejected judicially imposed
20 notice standards that exceed the requirements of 42 U.S.C. section
21 406(c).  Roberts, 2011 WL 1998337, at *2.

22

23 **B.   The ALJ Satisfied His Duty To Fully And Fairly Develop The Record**

24

25     Plaintiff argues that the ALJ did not satisfy his duty to fully and
26 fairly develop the record.  (Plaintiff's Memorandum at 4, 5).
27 Specifically, Plaintiff argues that the ALJ failed to develop the record
28 by not obtaining updated medical records and by not obtaining

1  information regarding the extent of Plaintiff's limitations as a result
2  of his CTS.  (Plaintiff's Memorandum at 5).  The Court disagrees.

4       The Ninth Circuit has found that "where the claimant is not
5  represented, it is incumbent upon the ALJ to scrupulously and
6  conscientiously probe into, inquire of and explore for all the relevant
7  facts.  He must be especially diligent in ensuring that favorable as
8  well as unfavorable facts and circumstances are elicited." Higbee v.
9  Sullivan, 975 F.2d 558, 561 (9th Cir. 1992) (per curiam) (citing Cox v.
10  Califano, 587 F.2d 988, 991 (9th Cir. 1978) (citations omitted); and
11  Heckler v. Campbell, 461 U.S. 458 470-73, 103 S. Ct. 1952, 1959-60, 76
12  L. Ed. 2d 66 (1983) (Brennan, J., concurring)).  Subsequent Ninth
13  Circuit cases have recognized this heightened duty.  See Tonapetyan v.
14  Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (stating that the ALJ's duty
15  to develop the record increases when the claimant is unrepresented or
16  is mentally ill and thus unable to protect her own interests).

18       However, only ambiguous evidence, or the ALJ's own finding that the
19  record is inadequate to allow for proper evaluation of the evidence,
20  triggers the ALJ's duty to conduct an appropriate inquiry or gather
21  additional information.  Id.; Webb v. Barnhart, 433 F.3d 683, 687 (9th
22  Cir. 2005); see also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir.
23  2002) (duty not triggered where the ALJ did not make a finding that the
24  medical report was inadequate to make a disability determination);
25  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011) (stating "[a]
26  specific finding of ambiguity or inadequacy of the record is not
27  necessary to trigger [the ALJ's] duty to inquire, where the record
28  establishes ambiguity or inadequacy").

1     An ALJ may discharge his duty to develop the record by issuing
2  subpoenas for records, submitting questions to a claimant's physicians,
3  continuing the hearing, or keeping the record open after the hearing to
4  supplement the record.  Tonapetyan, 242 F.3d at 1150.  However, this
5  list is not exhaustive.  Id.

6

7     Assuming that the incomplete medical records triggered the ALJ's
8  duty to develop the record, the ALJ discharged his duty by requesting
9  records, scheduling examinations and diligently questioning Plaintiff.
10  On June 25, 2008, the ALJ requested records from St. Rose Dominican
11  Hospital. (AR 144-45).  On December 24, 2008, the ALJ requested records
12  from Riverside County Regional Medical Center. (AR 164-65).  The Agency
13  scheduled Dr. Siciarz to examine Plaintiff On September 19, 2008. (AR
14  172-76).  The Agency also scheduled Dr. Abejuela to examine Plaintiff
15  on January 28, 2009. (AR 186-92).  On January 13, 2009, the Agency
16  followed up with Riverside County Regional Medical Center. (AR 207).
17  The Agency satisfied its duty by requesting records and scheduling
18  examinations.

19

20     In addition, the ALJ diligently examined Plaintiff during the March
21  2, 2010 hearing to elicit testimony that would either clarify the
22  evidence already in the record or find additional sources of records.
23  (AR 25-47).  The ALJ asked Plaintiff regarding any treatments he
24  received for his back, such as surgery. (AR 30, 34).  The ALJ also
25  asked what treatments Plaintiff had sought for other conditions, such
26  as a gastric bypass and a "Lap-Band." (AR 41-42).  The ALJ asked if
27  Plaintiff had any other diagnostic tests, such as x-rays or MRIs. (AR
28  32).  The ALJ asked Plaintiff regarding his medication. (AR 32).  The

ALJ received a copy of the MRI taken by Dr. Sadler. (AR 33). The ALJ asked about Plaintiff's specific limitations. (AR 35). The ALJ asked about Plaintiff's daily activities. (AR 37-40). Finally, the ALJ asked the Plaintiff to explain or describe any other problems that he would like the ALJ to consider. (AR 44). Clearly, the ALJ affirmatively sought information and satisfied its duty to develop the record.

Furthermore, any additional attempts to obtain records would have been futile. At the hearing, Plaintiff testified that his last x-ray was likely taken at Riverside General during an emergency room visit in 2008. (AR 32). However, the ALJ had already obtained records from Riverside General regarding a 2008 emergency room visit that did not include x-rays and had not received any new records after a follow up phone call in January 2009. (AR 166-72, 207). Moreover, Plaintiff stated in a disability report that no additional medical tests had been done or scheduled since June 20, 2008, and he also stated that he had not been hospitalized for psychiatric reasons or received any psychiatric treatment. (AR 106, 187). Therefore, any additional requests for records would not have added any additional information because the ALJ had already obtained substantially all of Plaintiff's records.

Plaintiff argues that the ALJ failed to obtain updated medical records especially in light of Plaintiff's pro se status. (Plaintiff's Memorandum at 4, 5-6). Arguably, Plaintiff reported additional medical appointments in February, June and November 2009. (AR 140). However, Plaintiff only reported receiving medication identical or similar to his already reported medication. (AR 141-43). Plaintiff did not mention

33

1  any additional diagnostic tests or diagnoses made by these doctors that
2  would add additional information to support Plaintiff's case.  (AR 140-
3  43).  Therefore, the ALJ satisfied his duty to develop the record, and
4  this Court finds no reason to remand Plaintiff's claim.

6  **C.**    **The ALJ Did Not Err By Omitting Mention Of Plaintiff's 1998 Record**
7         **Regarding Carpal Tunnel Syndrome**

9         Plaintiff argues that the ALJ failed to properly consider all of
10  the relevant medical evidence.  (Plaintiff's Memorandum at 6).
11  Specifically, Plaintiff argues that the ALJ must account for Dr.
12  Sadler's November 3, 1998 assessment.  (Plaintiff's Memorandum at 6).
13  The Court disagrees.

15      An ALJ must make consider the combined effect of all impairments
16  whether or not each impairment is severe enough to render a claimant
17  disabled.  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th
18  Cir. 2003).  However, an ALJ need not discuss all evidence presented to
19  him.  Id.; Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984)
20  (per curiam).  An ALJ need only explain why the ALJ rejected
21  significantly probative evidence.  Vincent, 739 F.2d at 1395; Flores v.
22  Shalala, 49 F.3d 562, 571 (9th Cir. 1995).

24      An ALJ may reject medical opinions formed prior to the relevant
25  time period, especially when evidence suggests that the disability did
26  not continue through the relevant time period, because these opinions
27  are not significantly probative.  Burkhart v. Bowen, 856 F.2d 1335, 1340
28  n.1 (9th Cir. 1988) (reasoning that the ALJ properly rejected a medical

opinion formed prior to the relevant time period when the doctor also noted improvement). Here, Dr. Sadler opined in 1998 that Plaintiff suffered Carpal Tunnel Syndrome that restricted the capabilities of Plaintiff's arms, approximately ten years before the relevant time period. (AR 212-224). Since that diagnosis, Plaintiff worked as a security guard and cashier providing strong evidence that the Plaintiff's impairment had diminished or possibly resolved. (AR 138-139). Additionally, Dr. Siciarz noted that none of Plaintiff's joints showed swelling or deformity and all ranges of motion were within normal limits during a 2008 examination. (AR 174). Therefore, the Court finds that the ALJ appropriately disregarded Dr. Sadler's opinion regarding Plaintiff's CTS because it was not significantly probative.

Even if the ALJ erred by not discussing Dr. Sadler's opinion regarding Plaintiff's Carpal Tunnel Syndrome, the error was harmless. A court will not overturn an ALJ's decision if, despite error, the decision remains legally valid. See Carmickle v. Comm'r of Social Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008); Tommasetti v. Astrue, 533 F.3d 1035, 1042-43 (9th Cir. 2008); Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006). Here, even if the ALJ included the CTS evidence, the ALJ would have most likely found that Plaintiff, a thirty-seven year old individual with a high school education and no language limitations, could work. (AR 29, 83, 93, 98, 188). Indeed, the inclusion of CTS evidence may have added limitations to Plaintiff's residual functional capacity, but would not render Plaintiff disabled considering that the ALJ noted that Plaintiff's daily activities involved the same physical and mental skills needed to maintain employment. (AR 13). Therefore, any error was harmless.

35

D.    **The ALJ Properly Rejected Plaintiff's Credibility**

Plaintiff argues that the ALJ improperly rejected Plaintiff's subjective complaints. (Plaintiff's Memorandum at 7-10). Specifically, Plaintiff argues that "the ALJ has failed to specify which allegations of pain and/or other symptoms he found not credible," "appl[y] the factors mandated by Social Security Ruling 96-7P," and "state clear and convincing reasons for rejecting Plaintiff's testimony." (Plaintiff's Memorandum at 9). The Court disagrees.

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (citing Bunnell v. Sullivan, 947 f.2d 341, 344 (9th Cir. 1991) (en banc)) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptoms she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (quoting Smolen v. Chater, 80 f.3d 1273, 1282 (9th cir. 1996)).

Second if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281. An ALJ may rely on "prior inconsistent statements," "unexplained or inadequately

36

1  explained failure to seek treatment or to follow a prescribed course of

2  treatment" or "the claimant's daily activities" to make a credibility

3  determination.  Id. at 1284.  The ALJ must make specific findings to

4  allow the court to conclude that "the ALJ did not arbitrarily discredit

5  claimant's testimony." Turner v. Comm'r of Soc. Sec., 613 F.3d 1217,

6  1224 n.3 (9th Cir. 2010) (quoting Thomas, 278 F.3d at 958).

7

8      In addition, Social Security Ruling 96-7P requires an ALJ to

9  consider the following factors in addition to the objective medical

10  evidence when assessing an individual's credibility: (1) the

11  individual's daily activities; (2) the location, duration, frequency and

12  intensity of an individual's symptoms; (3) factors that precipitate or

13  aggravate symptoms; (4) the type and effectiveness of an individual's

14  medication; (5) treatment beyond medication that the individual has

15  received; (6) other measures that the individual uses to alleviate

16  symptoms; and (7) any other factors concerning the individual's

17  restrictions or limitations due to symptoms.  Here, the ALJ satisfied

18  the relevant standards and appropriately rejected Plaintiff's

19  credibility.

20

21      Plaintiff's argument that the ALJ did not specify which testimony

22  was not credible lacks merit.  In his decision, the ALJ initially

23  explains why Plaintiff does not have a severe mental impairment, and

24  then discusses Plaintiff and Plaintiff's mother's functional reports.

25  (AR 13-14).  Each functional report discusses Plaintiff's alleged anti-

26  social behavior and physical limitations due to pain.  (AR 110-25).  The

27  ALJ also noted, however, a "lengthy face-to-face interview with

28  [Plaintiff] and noted [he] had no physical or mental problems besides

1  exhibiting problems with standing." (AR 14). The ALJ subsequently found
2  that "the claimant's statements concerning the intensity, persistence
3  and limiting effects of these symptoms are not credible to the extent
4  that are inconsistent with the above residual functional capacity
5  assessment." (AR 14).   Although the phrase "these symptoms" may be
6  ambiguous when read in isolation, in context, "these symptoms" clearly
7  refer to Plaintiff's alleged mental impairments and limitations due to
8  pain.   Therefore, the Court finds that the ALJ here clearly specified
9  that he rejected Plaintiff's testimony regarding his pain and mental
10 impairments.

11

12     Plaintiff's argument that the ALJ did not provide clear and
13 convincing reasons to reject Plaintiff's testimony also lacks merit.   In
14 his decision, the ALJ observed that Plaintiff could "maintain[] his
15 personal care, prepar[e] his own meals, rid[e] in a car, shop[] for
16 personal items, manag[e] his finances, and spend[] time with others."
17 (AR 13).   The ALJ stated that "in order [for Plaintiff] to perform the
18 above-described activities of daily living are the same as those
19 necessary for obtaining and maintaining employment." (Id.).   The ALJ
20 found "no medical evidence indicating [Plaintiff] received any mental
21 treatment," (AR 11), and that "[Plaintiff's] medical records involving
22 the relevant time period reveal [Plaintiff] was overall stable . . . ."
23 (AR 16).   The ALJ found that Plaintiff's records "document routine and
24 conservative care for his impairments.   [Plaintiff's] alleged
25 impairments are remediable with current conservative care." (AR 16).
26 Furthermore, the ALJ found that Plaintiff "was not seeking any
27 psychiatric treatment or taking any psychiatric medication,"

28

38

1  demonstrating a failure to seek treatment.  (Id.) (internal citation
2  omitted).

4      The ALJ also discussed the observations of interviewers and
5  consulting examiners.  The ALJ stated that a "claims representative
6  conducted a lengthy face-to-face interview with [Plaintiff] . . . The
7  claims representative noted [Plaintiff] was pleasant and cooperative;
8  [Plaintiff] was observed not to be in any apparent distress." (AR 14).
9  The ALJ also noted that both Dr. Siciarz and Dr. Abejuela noted that
10 Plaintiff was "overall normal." (AR 15). Finally, the ALJ also noted
11 that Dr. Abejuela found Plaintiff had no or mild mental limitations.
12 (AR 16).  Therefore, the ALJ did not arbitrarily discredit Plaintiff's
13 testimony but rather found that Plaintiff was not credible because his
14 testimony was inconsistent with the observations and findings of
15 examining doctors, his daily activities, and because Plaintiff did not
16 pursue more aggressive treatments.

18     The ALJ's conclusions are supported by substantial evidence in the
19 record.  Plaintiff reported in his adult function report that he could
20 maintain his personal care, prepare his own meals, ride in a car, shop
21 for personal items, manage his finances and spend time with others. (AR
22 119-23).   Plaintiff's physical examination revealed very few
23 abnormalities. (AR 173-175).  Plaintiff's psychological evaluation
24 revealed little to no functional impairment. (AR 191).  The claims
25 representative observed Plaintiff in a face-to-face interview and noted
26 that Plaintiff displayed no difficulties with any major functional
27 categories. (AR 91).  Although Plaintiff testified that he had an
28 epidural and doctors recommended surgery, (AR 31-32), the medical

1   records simply do not support Plaintiff's testimony.  Plaintiff's
2   medical records fail to make any mention of surgery other than Dr.
3   Sadler stating Plaintiff was not a candidate for surgery.  (AR 221).
4   The record shows that Plaintiff primarily relies on over-the-counter
5   medication for his pain, (AR 118, 142-43), and has not received
6   psychiatric treatment. (See, e.g., AR 187).  Furthermore, Plaintiff has
7   reported inconsistent information to the Agency.  For example, Plaintiff
8   testified on March 3, 2010 that he could not drive and had not driven
9   a car in two years yet reported in his adult function report dated
10  January 3, 2009 that he did drive.  (AR 37-38, 121 ("Do you drive?
11  Yes").  Therefore, the ALJ's conclusion that Plaintiff was not entirely
12  credible was supported by substantial evidence in the record.

13

14  **E.   The ALJ Properly Considered And Rejected The Third Party Statement**
15       **From Plaintiff's Mother**

16

17       Plaintiff argues that the ALJ failed to properly consider the third
18  party report prepared by Plaintiff's mother.  (Plaintiff's Memorandum
19  at 10-11).  Specifically, Plaintiff argues that the ALJ cited irrelevant
20  reasons to reject the third party report prepared by Plaintiff's mother
21  and that the fact that Plaintiff's mother is related to Plaintiff should
22  not undermine her statements.  (Id.).  No remand is required this claim.

23

24       In determining whether a claimant is disabled, an ALJ must consider
25  lay witness testimony concerning a claimant's ability to work.  Stout
26  v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. July 25,
27  2006); Smolen, 80 F.3d at 1288; 20 C.F.R. §§ 404.1519(d)(4) & (e), and
28  416(d)(4) & (e).  The ALJ may discount the testimony of lay witnesses

only if she gives "reasons that are germane to each witness." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (citing Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)); see also Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." (citations omitted)).  If the ALJ's ultimate credibility determination and reasoning are adequately supported by substantial evidence in the record, no remand is required.  Carmickle, 533 F.3d at 1162.

Plaintiff's mother prepared a third party function report that was extremely similar to Plaintiff's adult function report.  (Compare AR 118-125 with AR 110-117).  In some instances, the wording was nearly identical.  Plaintiff described his sleep as "sleeping 4-5 hours a night of broken sleep if I sleep at all due to pain."  (AR 119).  Plaintiff's mother states "Plaintiff cannot sleep at times due to pain.  Sleeps 4-5 hours of broken sleep a night."  (AR 111).  Plaintiff states he is "unable to put shoes on without pain."  (AR 119).  Plaintiff's mother reported that Plaintiff is "unable at time[s] to put shoes on without pain."  (AR 111).

Many other similarities permeate their reports.  Plaintiff and his mother reported that Plaintiff is able to make quick simple meals "maybe once a day" but is "unable to stand for [a] long time."  (AR 112, 120). Similarly, they bot report that Plaintiff can participate in chores with assistance from family members (AR 112, 120); that Plaintiff goes outside "maybe once a week if that"  (AR 113, 121); that Plaintiff goes

shopping in stores for personal items and that he takes "maybe 30-60 min." when shopping (AR 113, 121); that Plaintiff can manage his finances, (AR 113, 121), and has become anti-social. (AR 115, 123). Both listed that Plaintiff's disabilities affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, use hands, and get along with others. (AR 115, 123).

The ALJ provided three reasons to reject Plaintiff's mother's third party function report: (1) it provides "very little probative value" because it mirrors Plaintiff's function report; (2) Plaintiff's mother cannot make a diagnosis or argue the severity of Plaintiff's symptoms because she is not a medical professional; (3) Plaintiff's mother has a pecuniary motivation to help Plaintiff obtain benefits. (AR 14).

The ALJ's finding that the testimony of Plaintiff's mother mirrored Plaintiff's testimony provided two germane reasons to reject her testimony. An ALJ may reject lay witness testimony if the witness's testimony is inconsistent with the medical evidence. Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005). Here, the ALJ found that the testimony of Plaintiff's mother "mirror[ed] Plaintiff's function report." (AR 14). The ALJ subsequently properly found that "[Plaintiff's] subjective complaints are less than fully credible and the objective medical evidence does not support the alleged severity of symptoms." (AR 16); see supra VII.D. Therefore, the ALJ found that the testimony of Plaintiff's mother was inconsistent with the objective medical evidence because it alleged the same restrictions as Plaintiff's discredited subjective complaints. Valentine, 574 F.3d at 694. Furthermore, Plaintiff's mother did not provide any additional testimony

1  beyond repeating Plaintiff's own testimony, and her testimony was not
2  significantly probative and could be disregarded. See Vincent, 739 F.2d
3  at 1395.

4

5     The ALJ also provided a germane reason to reject the testimony of
6  Plaintiff's mother by finding her not competent to argue the severity
7  of the claimant's symptoms in relation to his ability to work. (AR 14).
8  Credible lay witness testimony that is consistent with the medical
9  evidence may be competent evidence to show the severity of Plaintiff's
10 symptoms and how it affects a Plaintiff's ability to work. See Bruce
11 v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009). Here, as discussed
12 above, the ALJ necessarily found that the testimony of Plaintiff's
13 mother was not consistent with the objective medical evidence and was
14 therefore properly rejected on this ground. (AR 14).

15

16    Additionally, an ALJ may reject lay witness testimony if the ALJ
17 finds evidence that the witness "exaggerated a claimant's symptoms in
18 order to get access to his disability benefits. . . ." Valentine, 574
19 F.3d at 694 (original emphasis omitted). Here, the ALJ found that
20 Plaintiff's mother had no attachment to employment. (AR 14).
21 Plaintiff's testimony at the hearing supports the ALJ's finding.
22 Plaintiff testified that his mother's only sources of income are
23 payments from a foster care program, disability benefits, and
24 Plaintiff's food stamps. (AR 42-43). As discussed above, the ALJ found
25 that the medical evidence, Plaintiff's daily activities, and
26 conservative treatment fail to support the alleged severity of
27 Plaintiff's symptoms. Altogether, the ALJ found Plaintiff's mother had
28 a pecuniary interest to exaggerate, and she likely did exaggerate

43

because her testimony was inconsistent with the medical evidence. Therefore, the ALJ provided a germane reason to discredit the testimony of Plaintiff's mother.

Furthermore, even if the ALJ erred by disregarding the testimony of Plaintiff's mother, any error was harmless. Because the testimony of Plaintiff's mother was substantively identical to Plaintiff's testimony, its inclusion in the decision would not add any evidence that for the ALJ to consider, and her testimony would not affect the outcome of Plaintiff's case. See Stout, 454 F.3d at 1056 ("[Where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different determination."). Therefore, even if the ALJ committed error, the error was harmless.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**VIII.**

**CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[2] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 8, 2011

                                            /S/
                              _____
                              SUZANNE H. SEGAL
                              UNITED STATES MAGISTRATE JUDGE

---

[2]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

45